**FLOUR MILLS OF AMERICA, INC.,**
Plaintiff in Error,

v.

**AMERICAN STEEL BUILDING COMPANY,**
Inc., H. T. Petersen, a Sole Trader, d/b/a
P & M Sales, and Belger Cartage Service,
Inc., Defendants in Error.

No. 41154.

Supreme Court of Oklahoma.

Feb. 6, 1968.

As Amended Jan. 27, 1969.

Rehearings Denied Jan. 28, 1969.

John B. Doolin, Harris, Newcombe, Redman & Doolin, Lawton, Alvin D. Shapiro, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for plaintiff in error.

Frank Carter, Otjen, Carter & Huddleston, Enid, John Murphy, Paul Scott Kelly, Jr., Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, Mo., for defendants in error.

LAVENDER, Justice.

This is an action for money judgment and for the establishment and foreclosure of a mechanics' and materialmen's lien.

The case arose out of three contracts. The first was a written contract dated April 14, 1961, between the plaintiff in error (hereinafter called "Flour Mills"), owner of the real property involved, and H. T. Petersen, a sole trader doing business as P & M Sales (hereinafter called "Petersen"), as prime contractor, for the construction on Flour Mills' property in the City of Alva, Oklahoma, of a certain building as an addition to Flour Mills' grain storage facilities on such property. The building was to be built according to plans and specifications included in the contract as a part thereof, for a basic contract price of $281,500.00. The second contract, admittedly entered into April 14, 1961, was between Petersen and the plaintiff in the trial court, American Steel Building Co., Inc. (hereinafter called "American"). Under this agreement American was to furnish all of the structural steel and do all of the structural steel work, and provide and install a corrugated steel roof on the building, required by the prime contract, for a basic price of $127,770.00. The third contract, entered into on or about June 1, 1961, between American and Belger Cartage Service, Inc. (hereinafter called "Belger"), was one in which Belger agreed to provide, and did provide, certain heavy equipment and operators therefor for use by American in performing its subcontract with Petersen, at a total cost of $8,333.26.

At the time of the commencement of the action, American's subcontract with Petersen, and Petersen's prime contract with Flour Mills, had been fully performed, ex-

cept that Flour Mills claimed that the roof of the building leaked when it rained, because of defects in materials or workmanship, or both, the curing of which defects would cost at least $40,000.00. Petersen claimed that he had been required to expend the sum of $5,340.74 for labor and materials in performing work which American had failed to perform in accordance with its subcontract with Petersen. Flour Mills had withheld from Petersen $40,000.00 of the contract price, and refused to pay Petersen for certain "extra" items not covered by the prime contract, which Petersen claimed he had furnished as changes in the plans and specifications at the request of Flour Mills, although Flour Mills admitted that Petersen had furnished some of the extra items claimed by him, at its request. Petersen had not paid American the full amount it claimed to be due under its subcontract and for extra items furnished by it at Petersen's request and had not paid the comparatively small claims of a number of other parties. American had not paid Belger the $8,333.26 due under their contract.

It was undisputed that timely and proper statements of claim of mechanics' and materialmen's liens against the real property involved had been filed by all of the claimants except Petersen—at least, his pleadings do not claim any such lien. It was also shown that prior to the trial, Flour Mills had, by agreement with Petersen and his surety, satisfied all of the claims except those of Petersen, American, and Belger, and Petersen admits that Flour Mills is entitled to credit against him for the amounts so paid.

American, as plaintiff, commenced this action against Flour Mills and Petersen and all of the lien claimants, praying for personal judgment against Flour Mills and Petersen in the amount of $64,388.53, with interest thereon at the rate of six per cent per annum from date of judgment until paid, with attorney's fee and the costs of the action, and also asking for judgment against all of the defendants, establishing its claimed mechanics' and materialmen's

lien as a first and prior lien against the real property involved and ordering the property sold to satisfy its judgment. American's claim in the amount of $64,388.53 is based upon the subcontract price of $127,770.00, with five separate adjustments for "extra" items not covered by the subcontract that would result in a net increase of $4,959.17, plus a performance bond premium, provided for in the subcontract, in the amount of $1,303.86, and $355.50 for additional materials required in performing the subcontract because of errors in the preliminary work of others, less credits for cash payments totaling $70,000.00.

Belger filed its answer, with cross-petition for personal judgment against American in the amount of $8,333.32, and against Flour Mills and Petersen in the amount of $8,333.32, with interest thereon at the rate of six per cent per annum from August 1, 1961, until paid, and for the costs of the action, including a reasonable fee for its attorney, and for judgment against the plaintiff and all of the other defendants, establishing its claimed mechanics' and materialman's lien and the priority thereof, and ordering the real property sold to satisfy its judgment. Petersen filed an answer denying that Belger was entitled to any judgment against him, and praying that Belger's cross-petition be denied as against him. Flour Mills' answer denied that it was indebted to Belger in any amount, but alleged that, if it was, it was entitled to judgment against Petersen in the same amount, with costs and attorney's fee, and prayed for judgment accordingly.

In its pleadings, as amended, Flour Mills admits the execution of its prime contract with Petersen, the execution of the subcontract between Petersen and American, the existence of some kind of agreement between American and Belger concerning American's use of Belger machinery and operators in performing the subcontract, and the substantial completion of the building and work covered by the prime contract and subcontract. As its basic defense to American's action, and Petersen's

cross action, against Flour Mills for amounts claimed to be due them under the prime contract and subcontract and for "extra" items actually furnished in accordance with provisions therefor in the prime contract, Flour Mills alleges that under provisions of the prime contract final payment did not become due, and would not become due, until the project engineer issued a certificate of completion, and the project engineer had never issued such a certificate because Petersen and American had failed to comply with the contract in that the roof was not weather-tight, but allowed rain to leak in, and Petersen and American failed and refused to do the things required by the project engineer to correct the defects. In a cross action against Petersen and American, Flour Mills alleges that it will be necessary for it to expend at least $40,000.00 to correct the defects in the roof to make it weather-tight as provided for in the prime contract and subcontract; that, as a result of the failure on the part of Petersen and American to provide a weather-tight roof as called for in the prime contract and subcontract, grain belonging to Flour Mills and stored in the building was spoiled, ruined and down-graded to its damage in the amount of $25,000.00; that Petersen and American failed to complete the various storage bins into which the building is divided by partitions within the times provided in the time schedule in the prime contract, and, under the provisions of the prime contract, Flour Mills is entitled to withhold an amount equal to $200.00 per day, as liquidated damages resulting from such delays, totaling $20,000.00, or, in the alternative, is entitled to damages for loss of anticipated profits in the amount of $96,000.00. Flour Mills prays for personal judgment against Petersen and American for $65,000.00 actual damages plus $20,-000.00 as liquidated damages, or, in the alternative, for $65,000.00 actual damages plus $96,000.00 damages for loss of anticipated profits, together with a reasonable attorney's fee of not less than ten per cent

of the amount of such judgment, and the costs of the action.

The trial court sustained demurrers of Petersen and American to Flour Mills' cause of action for damages for loss of anticipated profits, and Flour Mills excepted thereto.

In a pre-trial stipulation, Flour Mills admitted owing $38,274.30 of the prime contract price, and $10,607.84 for "extra" items not covered by the prime contract but furnished by Petersen as provided for in the prime contract, all subject to its claimed right to credit for $20,000.00 in liquidated damages, $25,000.00 actual damages to grain, and $40,000.00 to cure the alleged defects in the roof to make it weather-tight.

In his pleadings, as amended, Petersen alleges that any delay in completion of the building was at the request of, or was caused by the actions of, Flour Mills; that Flour Mills accepted, and stored grain in two of the three storage bins that comprise the building prior to the respective dates for completion thereof according to the time schedule in the prime contract; that the building, including the roof, was constructed in accordance with the prime contract; that the roof, as constructed, did not leak, and that any moisture that gathered on the roof inside the building and then dripped onto the stored grain was the result of condensation because of faulty design by Flour Mills' architects or engineers, in that they did not provide in the plans and specifications for an insulated roof to prevent such condensation; that any damages, real or anticipated, sustained by Flour Mills were the result of its own acts, but that, if the court should find that Flour Mills is entitled to any such damages, it would be because American had failed to perform its subcontract, and such damages should be charged against American. By separate cross-petition, Petersen asks for personal judgment against Flour Mills for whatever balance may remain unpaid on the base contract price after crediting Flour Mills with all amounts paid by

Flour Mills to Petersen and those claiming liens under him, plus reimbursement as provided in the prime contract of $2,669.40 sales and use taxes, and license fees paid by him in performing the contract, plus $39,542.68 as the reasonable value of "extra" labor and materials furnished by him, in addition to that required by the prime contract, at the specific instance and request of Flour Mills. By separate cross-petition, Petersen prays for personal judgment against Flour Mills and American in the amount of $250,000.00 for damages to his business and business reputation resulting from their failure to perform their contracts with him. And, by separate pleading Petersen admits the correctness of American's claim against him but subject to his counterclaim in the amount of $5,-340.74 for labor and materials furnished by Petersen in performing parts of American's subcontract which it failed to perform in accordance with the plans and specifications.

The case was tried to the court without a jury, and at the request of the parties, the trial court made separate findings of fact and conclusions of law, which, by reference, were made a part of the trial court's journal entry of its judgment as rendered on February 24, 1964.

Naturally, the trial court's judgment was rather complicated, and since (except for a cross appeal by American, mentioned later) only Flour Mills has appealed to this court, we shall first outline only those portions of the judgment which affect Flour Mills or its real property involved in the action.

In addition to denying Flour Mills' cross-actions against Petersen and American, and Petersen's cross-action against Flour Mills and American for consequential damages, and taxing all costs of the action (including a fee of $9,500.00 for American's attorneys and a fee of $833.33 for Belger's attorneys) against Flour Mills, the trial court rendered the following money judgments against Flour Mills:

(a) In favor of Petersen, against Flour Mills, in the amount of $73,567.44 (as the balance of the prime contract price, plus "extras" proved by Petersen or admitted by Flour Mills), with interest thereon at the rate of six per cent per annum from the date of the judgment, February 24, 1964, until paid;

(b) In favor of American, against Flour Mills and Petersen, in the amount of $64,388.53 (as the balance of the subcontract price, plus "extras" proved), with interest thereon at the rate of six per cent per annum from the date of judgment, February 24, 1964, until paid;

(c) In favor of American, judgment over against Flour Mills, in an amount equal to interest at the rate of six per cent per annum on $8,333.32 (the amount of a judgment in favor of Belger against American, bearing interest at the rate of six per cent per annum from August 1, 1961, until paid) from August 1, 1961, to the date of judgment, February 24, 1964;

and established mechanics' and materialmen's liens against the real property involved as follows:

First: In favor of Belger, in the amount of its judgment against American: $8,333.32 with interest thereon at the rate of six per cent per annum from August 1, 1961, until paid, plus an attorney fee of $833.33;

Second: In favor of American (and subject only to Belger's lien, above mentioned), in the amount of its judgment: $64,388.53, with interest thereon at the rate of six per cent per annum from the date of judgment, February 24, 1964, until paid, plus an attorney fee of $9,500.-00.

The judgment also provides that Flour Mills shall receive credit on American's lien in the amount of $64,388.53 plus interest, for any amounts paid by Flour Mills to satisfy Belger's lien, except as to any amounts so paid on account of interest on the $8,333.32 involved therein for interest from August 1, 1961, to the date of judgment, February 24, 1964; and that Flour Mills shall receive credit on Petersen's judgment in the amount of $73,567.44 plus

interest, for any amounts paid by Flour Mills (not in excess of $64,388.53 with interest thereon at the rate of six per cent per annum from the date of judgment, February 24, 1964) to satisfy American's lien for $64,388.53 plus interest, but shall not receive any credit on Petersen's judgment for any amounts paid by Flour Mills on account of the $9,500.00 attorney fee allowed American.

The judgment further provides for the foreclosure of the liens upon failure of the judgment debtors to satisfy the judgments.

Flour Mills filed a motion for a new trial, and after the overruling thereof by the trial court, perfected an appeal to this court, presenting its arguments for reversal of those parts of the judgment that adversely affect it under eight propositions:

1. The trial court failed to enforce the contract between the parties.

2. The contract required a certificate of completion and acceptance of the building by the project engineer before final payment would become due, and in the absence of fraud on his part, or such gross mistake on his part as would necessarily imply bad faith or a failure to exercise an honest judgment, such engineer's determination that the building had not been completed in accordance with the contract, and would not be accepted as complete, was absolutely binding on the parties.

3. Under the contract, Flour Mills was entitled to damages for failure to complete the building within the time schedule prescribed in the contract, and in the absence of any written application for extensions of such time and the allowance thereof by the project engineer, Flour Mills should have been allowed to show either (a) accrual of liquidated damages provided for in the contract, or (b) actual damages, and the amount thereof, in event the contractual provision for liquidated damages be void.

4. The trial court erred in refusing to admit evidence offered by Flour Mills that Petersen had admitted that Flour Mills did not owe him for any "extra" items; and also erred in rendering judgments against Flour Mills for any "extra" items not admitted by Flour Mills as being properly chargeable against it as "extras."

5. The fee for American's attorneys, assessed by the trial court as costs against Flour Mills, should have been surcharged against Petersen and deducted from any amounts deemed to be owed by Flour Mills to Petersen, and, in any event, such attorneys' fee is grossly excessive in amount.

6. The trial court erred in penalizing Flour Mills for American's failure to pay Belger, by requiring Flour Mills to pay interest from August 1, 1961, to the date of the judgment, on Belger's claim.

7. Under the law, Flour Mills is entiled to recover for water damage to 495.-66 bushels of wheat, sustained by Flour Mills in an attempt to minimize its damages resulting from the failure of Petersen and American to complete the building according to the time schedule prescribed in its contract with Petersen.

8. A performance bond premium is not a lienable item and American's lien should be reduced by $1,303.86, the amount included for such a premium in American's judgment and lien in the principal amount of $64,388.53.

As an aid to defining the issues presented by Flour Mills' appeal as argued in its briefs, we note that:

(a) Petersen did not seek to establish, and the trial court's judgment does not establish, any mechanic's or materialman's lien in his favor.

(b) Flour Mills does not, on the ground that there was no privity of contract between it and American, contend that the trial court erred in rendering any money judgment against Flour Mills for amounts found to be due American under its subcontract with Petersen or for "extra" items found to be due American.

(c) Except with respect to $1,303.86 for performance bond premium that is included in American's money judgment, and lien, in the principal amount of $64,388.53, which Flour Mills contends in the eighth proposition is not a lienable item under the statutes relating to mechanics' and materialmen's liens (without contending that it was error to include such item in American's money judgment), Flour Mills does not contend that the trial court erred in establishing a mechanic's and materialman's lien against the real property involved in the action, in favor of either American or Belger, for the principal amounts specified in their respective money judgments, with interest thereon as provided in the judgment.

(d) Flour Mills does not contend that any part of the trial court's judgment is erroneous because not supported by the evidence or contrary to the evidence.

(e) Except with respect to the contention that a performance bond premium is not a lienable item under the statutes relating to mechanics' and materialmen's liens [mentioned in (c) above], and a contention made under the fifth proposition that the attorneys' fee allowed American for its attorneys is grossly excessive in amount, and a contention made under the seventh proposition that Flour Mills is entitled to special damages to 495.66 bushels of wheat incurred in its attempt to minimize its damages from breach of contract by Petersen and American, Flour Mills' basic argument throughout its briefs is that in rendering judgments against Flour Mills in favor of Petersen and American (including the denial of Flour Mills' cross actions against them), the trial court ignored certain provisions of the contracts involved, or, as stated in the first proposition, made a new contract for it and Petersen.

As stated, Flour Mills' basic argument on its appeal herein is that, in rendering its judgments against Flour Mills, the trial court ignored certain provisions of the contracts involved and, in effect, made new contracts for the parties.

We deem it unnecessary to discuss this first proposition separately, as the particular instances in which Flour Mills contends that the trial court ignored specific provisions of the contract are discussed under other propositions.

Flour Mills' second proposition is essentially that the parties agreed to be bound conclusively by the determination of the project engineer as to questions involving whether the work was done in accordance with the contract provisions and specifications and that the determination by the engineer that the roof leaked and that such leak was the result of failure of the contractors to perform the work properly was binding upon the contractors. Flour Mills agrees that such determination would not be binding if fraud or bad faith could be shown on the part of the engineer. Flour Mills points out that nothing of this kind was contended nor found to exist by the trial court.

It is true that no fraud, bad faith, or even a gross mistake such as to imply bad faith on the part of the engineer in making his determination, was either alleged or shown by the evidence in this record. The most that can be said for the evidence appearing in the record, which we have reviewed, is that the engineer was honestly mistaken in his judgment as to the cause of the water being inside the building. The defendant Petersen and the plaintiff, American, both contended successfully, as far as the trial court was concerned, that the water inside the building got there as a result of condensation, which was in turn the result of failure to include insulation under the roof in the original design of the building and was immediately caused by a difference in air temperature between the air outside and the air inside of the building. There was evidence that the temperature inside the sheet iron building would rise during hot summer weather and that a sudden shower would cause condensation.

There does not seem to be any real dispute concerning the sufficiency of the evi-

dence to support the trial court's judgment that the water resulted from condensation. The dispute and contention of Flour Mills is, rather, to the effect that the trial court had no authority to hear evidence on this question because it would tend to impeach the decision of the project engineer that the cause of· the leaking roof was failure to perform the work by the contractor according to the contract.

Flour Mills' contention is centered upon the rule recognized in this jurisdiction by such cases as National Surety Co. v. Board of Education of City of Hugo (1917) 62 Okl. 259, 162 P. 1108 and City of Lawton v. Sherman Machine & Iron Works (1938), 182 Okl. 254, 77 P.2d 567. In National Surety we quoted 6 R.C.L. 340 with approval, as follows:

" 'Where the parties to a construction contract designate a person, such as an architect or engineer, who is authorized to determine questions relating to its execution, and stipulate that his determination shall be final and conclusive, both parties are absolutely bound by his determination of those matters which he is authorized to determine, except in case of fraud, or such gross mistake on his part as would necessarily imply bad faith or a failure to exercise an honest judgment. * * *' "

In City of Lawton v. Sherman Machine & Iron Works, supra, the contract there provided:

" 'To prevent all disputes and litigations, it is further agreed by the parties hereto that the City Engineer shall, in all cases, determine the amount and quality of the work of the several kinds of work which is to be paid for under the terms of this contract; and he shall decide all questions which may arise relative to the execution of the contract, on the part of the contractors; and his estimates and conclusions shall be final and conclusive.' "

No such provision, as last cited, appears in the contracts involved in this proceeding. However, Section 5 of the prime contract does provide:

"Final payment shall be due ten days after substantial completion of the work provided the work be then fully completed and the contract fully performed. Upon receipt of written notice that the work is ready for final inspection and acceptance, a licensed professional engineer, selected by Owner (hereinafter referred to as the 'Engineer') shall make such inspection, and *when he finds the work acceptable under the Contract and the Contract fully performed,* he shall promptly issue a final certificate, over his own signature, stating that the work provided for in this Contract is completed and is accepted by him under the terms and conditions thereof, and that the entire balance found to be due the Contractor, and noted in said final certificate, is due and payable. * * *'" (Emphasis supplied)

The precise question therefore is whether the parties here did in fact agree (impliedly or otherwise) that the decisions of the project engineer as to whether the contractor has performed his obligations in accordance with the specifications of the contract should be binding and conclusive upon the contractors barring the right in those persons to attack the correctness of such decision in a court of law (assuming no fraud or bad faith on the part of the engineer).

Flour Mills argues that it is not necessary to use the exact words "final and conclusive," in the contract in order to make the rule stated in paragraph 340 of 6 R.C.L. supra, applicable, and that by the provisions of Section 5 of the prime contract, supra, and provisions contained in Articles 25, 26, and 19 of the "General Conditions" of the prime contract, the parties, in effect, so stipulated and made the project engineer the final arbiter of all such questions arising before, or after, final acceptance of the work.

Article 25 of the "General Conditions" cited by Flour Mills, provides that not lat-

er than the date when each payment under the contract falls due, the engineer shall issue to the contractor a certificate for such amount as he decides to be properly due, or shall state in writing his reasons for withholding a certificate; and also provides that no certificate issued to the contractor shall be an acceptance of any work or materials not in accordance with the contract. Article 26 of the "General Conditions" cited by Flour Mills provides that the engineer may withhold or, on account of subsequently discovered evidence, nullify the whole or a part of any certificate to such extent as may be necessary to protect the owner from loss on account of (among other things) defective work not remedied. Article 19 of the "General Conditions", also cited by Flour Mills, requires the contractor to remove all work "condemned" by the engineer as failing to conform to the contract and to replace and re-execute the work without expense to the owner.

We also note that Article 20 of the "General Conditions", not mentioned by Flour Mills, provides that neither the final certificate nor payment nor any provision in the contract documents shall relieve the contractor of responsibility for faulty materials or workmanship, and that "All questions arising under this Article shall be decided by the Engineer subject to arbitration;" that Article 39 of the "General Conditions," also not mentioned by Flour Mills, provides that:

"The Engineer shall, within a reasonable time, make decisions on all claims of the Owner or Contractor and on all matters relating to the execution and progress of the work or the interpretation of the Contract Documents. The Engineer's decisions, *in matters relating to artistic effect,* shall be final, if within the terms of the Contract Documents;" (Emphasis supplied)

and that Section 3 of the prime contract, also not mentioned by Flour Mills, provides that:

"The Owner shall pay the Contractor for the performance of the Contract, subject to additions and deductions provided therein, in current funds, for the entire structure, complete in accordance *with the Specifications,* the sum of $281,500.00."

 Therefore, considering the absence of any specific provision that the determinations of the project engineer would be binding and conclusive upon the parties with respect to such matters as whether the roof was constructed in accordance with the contract specifications, and considering the above quoted express provisions of the contract, especially that provision that the issuance of such engineers' certificate shall not operate to excuse the contractor from liability for defective workmanship, we are of the opinion and hold that the parties to this contract were not conclusively bound by the engineer's determination concerning the roof. The question of whether Petersen and American had constructed the roof in accordance with its contractual obligations to do so was properly before the trial court and fairly decided by it based on the evidence submitted.

Flour Mills' Proposition II is therefore accordingly denied.

The third proposition attacks the trial court's refusal to allow Flour Mills to introduce any evidence concerning liquidated damages for delay in completion of the building, provided in the prime contract, or concerning Flour Mills' claim, in the alternative, for actual damages allegedly sustained by it as a result of the failure of Petersen and American to complete various portions of the building in question, and the building itself, within the times prescribed therefor in the prime contract.

 We first note that Flour Mills' claim, in the alternative, against Petersen and American for actual damages in the event that the contractual provision for liquidated damages be held to be void under 15 O.S.1961, §§ 214 and 215, is based entirely upon loss of anticipated profits; that the trial court sustained demurrers by Pe-

tersen and American to that part of Flour Mills' cross-action against them; that, although Flour Mills excepted to that ruling, it does not contend, in this proposition or in any other proposition, that the trial court erred in that ruling, but, in its brief herein, agrees with the trial court that evidence concerning the amount of damages from loss of anticipated profits would be highly speculative (and, therefore, would not be admissible). For these reasons, we do not consider herein that part of Flour Mills' argument under the third proposition that relates to actual damages for loss of anticipated profits.

The building in question was to be divided by two interior partitions, into three grain-storage compartments, under a single roof. Section 2 of the prime contract which, as mentioned above, was dated April 14, 1961, provides that:

> "The work to be performed under this contract shall be commenced immediately and shall be substantially completed not later than June 17, 1961. If such work is not completed prior to such time, there shall be deducted from the price to be paid to Contractor liquidated damages at the rate of $200.00 per day until such final completion of the work; provided, however, that such damages shall not accrue for failure to complete compartment No. 3, including roof, as shown on the plan contained in revised drawing No. FM until June 30, 1961; and provided further that such damages shall not accrue for failure to complete compartment No. 2, including roof, as shown on the plan contained in revised drawing No. FM 17 until June 24, 1961."

Apparently because the parties so construed this section of the prime contract, the trial court, in its findings of fact and conclusions of law, construed it as providing for substantial completion of compartment No. 1 by June 17, 1961, substantial completion of compartment No. 2 by June 24, 1961, and substantial completion of compartment No. 3, and the building, by June 30, 1961.

In its findings of fact, the trial court found among other things that during the month of May, 1961, several changes in the plans and specifications outlined in such findings, including the elimination of the interior partitions and the later restoration thereof, were made by Flour Mills; that, some time prior to July 18, 1961 (the exact date not being in evidence), and at the request of Flour Mills, the entire (concrete) floor of the building was raised by four inches, with the result that it became necessary for American to refabricate the steel partition columns by shortening them on the job-site, and to reweld the steel plates by which they were fastened to the rest of the structure; that on July 19, 1961, Flour Mills commenced usage of the building by causing some wheat to be stored in compartment No. 1, at a time when neither of the other two compartments was complete, and between July 19, 1961, and the middle of August, 1961, caused an additional 350,000 bushels of wheat to be stored in compartments Nos. 1 and 2; that not later than the middle of August, 1961, the entire building was "substantially completed" and ready for the use for which it was intended; and that all delay in completion, beyond the dates specified therefor in the prime contract, was due solely to changes in the plans and specifications ordered by Flour Mills and/or to causes beyond the control of the contractors.

Except for a contention (disposed of by our denial of the second proposition) that under the provisions of the prime contract, the building never has been completed, since the project engineer has never issued his final certificate of completion, Flour Mills does not take issue with the above-mentioned findings of the trial court.

The trial court's finding that all delay in completion beyond the dates specified therefor in the prime contract was due solely to changes in the plans and specifications ordered by Flour Mills and/or to causes beyond the control of the contractors—in effect, that all such delay was excused—was, of course, the basis for the

trial court's exclusion of any evidence concerning damages from such delay, on the ground that there was no proper foundation for any such evidence.

Flour Mills' contention in this proposition is that, since the building was not completed according to the time schedule and no claim or application for an extension of time for completion was made, in writing, to the project engineer, and the project engineer granted no extension of such time, the trial court's exclusion of any evidence concerning damages resulting from delay in completing the building, on the ground that all such delay was excused, ignored the emphasized portion of Article 18 of the "General Conditions" of the prime contract, which, insofar as pertinent herein, provides that:

> "If the Contractor be delayed at any time in the progress of the work by any act or neglect of the Owner or the Engineer, * * * or by any changes ordered in the work, or by * * * any causes beyond the Contractor's control, or by any cause which the Engineer shall decide to justify the delay, then the time of completion shall be extended *for such reasonable time as the Engineer may decide. No such extension shall be made for delay occurring more than seven days before claim therefor is made in writing to the Engineer. * * *"*

Flour Mills argues that, under such a provision, a written application for an extension of time within which to complete the work under the contract is a condition precedent to any such extension of time and, in the absence of any such written application, the contractor cannot be relieved of liability for liquidated damages prescribed for such delay even when the delay was caused by the contractee, citing: Ferber Construction Co. v. Board of Education of Borough of Hasbrouck Heights (N.J.Er. & App., 1917), 90 N.J.L. 193, 100 A. 329; Trauts Realty Corp. v. Casualty Co. of America (N.Y.), 166 N.Y.S. 807; Roberts v. Security Trust & Savings Bank et al. (1925), 196 Cal. 557, 575, 238 P. 673;

Wm. P. Jungclaus Co. v. Ratti et al. (1918), 67 Ind.App. 84, 118 N.E. 966; Ward v. Haren (St. Louis App., 1909), 139 Mo.App. 8, 119 S.W. 446; and Austin-Griffith, Inc. v. Goldberg (1953), 224 S.C. 372, 79 S.E.2d 447, 42 A.L.R.2d 1123.

Where the construction contract provided for liquidated damages for delay in completion of the contract but contained no provision, such as Article 18 of the "General Conditions" of the prime contract involved in the present case, under which another date for completion of the contract would be substituted for the one fixed in the contract, in event of delays for stated reasons, a number of cases from various jurisdictions, including Mosler Safe Co. v. Maiden Lane Safe Deposit Co. (1910), 199 N.Y. 479, 93 N.E. 81, 37 L.R.A., N.S., 363 (which is followed and extensively quoted from in Smith et al. v. City of Tahlequah, infra), have held that any substantial or material delay caused by the contractee or those for whom the contractee is responsible, such as its engineers, annuls or abrogates the contractual provision for liquidated damages, and in the Mosler Safe Company case, the rule was applied even though part of the delay was caused by the contractor, on the theory that, in such an instance, a court could not apportion the delay so as to provide a new date for the commencement of liquidated damages.

In the Mosler Safe Company case, the New York court pointed out that the parties to the contract involved in that case could have included a provision substantially the same as that contained in Article 18 of the "General Conditions" of the prime contract involved in the present case, and said that, with such a provision, the obligation to pay liquidated damages might be preserved.

Petersen and American cite Smith et al. v. City of Tahlequah (1926), 117 Okl. 204, 245 P. 994, as holding that any substantial delay in completion caused by the contractee annuls or abrogates the contractual provision for liquidated damages for delay in completion, even though the contract

also provides for obtaining extensions of time in event of such delays. In that opinion, this court did not quote the provision in question, but simply quoted the trial court's finding concerning it: " 'That in order to avail themselves of any deduction of time by reason of delay that they should have given the engineers notice in writing within 24 hours after it occurred.' " In its syllabus to the opinion, this court held that:

"A party to a contract cannot recover liquidated damages for a breach for which he himself is responsible or to which he has contributed, and, as a rule, there can be no apportionment of liquidated damages where both parties are at fault. Hence, if the parties are mutually responsible for the delays because of which the date fixed by the contract for completion is passed, the obligation for liquidated damages is annulled, and *in the absence of some provision contained in the contract under which another date can be substituted* it cannot be revived, except by express agreement." (Emphasis supplied)

Especially in view of the emphasized language in such syllabus and the complete reliance upon the Mosler Safe Company case, we believe that this court construed the contractual provision for written notice to the engineers within twenty-four hours after any delay did not constitute a provision under which another completion date could be substituted for the one fixed in the contract. Thus, Smith et al. v. City of Tahlequah is not in point herein.

Petersen and American cite Wright v. King (Tex.Civ.App., 1929), 17 S.W.2d 98, as holding that a building contractor is not chargeable with delay in doing extra work ordered by the contractee, even though he did not give the written notice provided for in the contract. Analysis of the opinion discloses that such holding referred only to the contractor and the contract involved in that case; that while an article in that contract was quite similar to Article 18, supra, it did not mention delays

caused by extra work ordered by the contractee; and that the Texas court held that such delays were not contemplated by that article of the contract. Changes ordered in the work are specifically mentioned in Article 18, supra, and Wright v. King is not in point herein.

All of the cases cited by Flour Mills, mentioned above, are in point herein, and they and other cases from other jurisdictions, such as Wait v. Stanton & Collamore et al. (1912), 104 Ark. 9, 147 S.W. 446, Equitable Real Estate Co., Ltd. v. National Surety Co. et al. (1913), 133 La. 448, 63 So. 104, Feeney v. Bardsley (1901) 66 N.J.L. 239, 49 A. 443, and Davis et al. v. La Crosse Hospital Ass'n (1904), 121 Wis. 579, 99 N.W. 351, hold that compliance with a contractual provision for an extension of time for completion of the contract is a condition precedent to relieving the contractor from the contractual liability for liquidated damages for delay in completion. This seems to be the general rule in such instances, although what might be considered as an exception thereto is to be noted in United States of America for Use of Gillioz v. John Kerns Construction Co. et al. (CCA, 8th Circuit, 1944), 140 F.2d 792, 152 A.L.R. 1340, wherein the contractee or those for whom it was responsible not only caused a number of delays prior to the completion date provided for in the contract involved, but after such completion date, and at a time when it was impossible to complete the contract within the time prescribed therefor, ordered substantial changes in the plans and specifications, and the court held, in effect, that such actions on the part of the contractee and those for whom it was responsible annulled or abrogated the contractual provisions for extensions of time as well as the contractual provisions for liquidated damages.

We think that the rule relied upon by Flour Mills in this argument is a proper general rule. Since the question of whether, under the circumstances of this case, an exception exists to such rule was not decided by the trial court, we do not pass upon that question herein.

In its findings of fact and conclusions of law, the trial court described Article 18, supra, as specifying that "if delays were occasioned by any act or neglect of the Owner or Engineer, or by any causes beyond the Contractor's control, then the time of completion should be extended." The court then found that all delays in completion of the contract, beyond the completion date specified therein, were due solely to changes in the plans and specifications ordered by Flour Mills and/or to causes beyond the contractor's control. The trial court completely ignored the portion of said Article 18 that provides for an extension of time for completion of the contract because of any delay occasioned by, among other things, any act or neglect of the owner or engineer or any causes beyond the contractor's control, such extensions to be allowed by the engineer upon written application therefor. The trial court did not go any further into the matter of liquidated damages and denied Flour Mills' cross-action therefor.

■■ The trial court committed reversible error in completely ignoring the portion of Article 18 of the "General Conditions" of the prime contract involved herein that requires written application for any extension of the completion time provided for in that article, and a decision thereon by the project engineer, and in its rulings based upon its erroneous interpretation of said Article 18, but we do not herein pass upon any other questions presented by Flour Mills' claim for liquidated damages for failure to complete the work within the time fixed in said prime contract.

The fourth proposition involves the claims by Petersen and by American for "extras"—items not covered by the prime contract or the contract price thereunder. Except for a contention that the trial court erred in refusing to admit certain evidence offered by Flour Mills that Petersen had admitted that Flour Mills did not owe him for any such "extras", the fourth proposition attacks the trial court's judgments against Flour Mills, in favor of Petersen and American, for "extras."

■ The rejected evidence involved in this proposition is Flour Mills' Exhibit 8, which Flour Mills' counsel refers to as a copy of Petersen's federal income tax return for the calendar year 1961, and contends that the assets shown on the balance sheet portion thereof as of the close of the taxable year shows only the balance that would be due under this contract if no offsets were allowed against it, and does not indicate any claim whatsoever for "extras." The exhibit was offered as an admission against interest and to test the credibility of Petersen's testimony on another point not involved in this appeal. The instrument appears to be a Xerox copy of a Form 1065 of the Internal Revenue Service, "U. S. Partnership Return of Income" for the calendar year 1961, in the name of P and M Sales Construction Co., is stamped "Taxpayer's Copy," shows the partners as Henry T. Petersen and Stanley Peoples, states that the partnership commenced business on 11–1–61, and apparently was prepared by some one other than a partner or member of the firm. The exhibit does not disclose any signature whatsoever. Petersen testified that he did not know whether or not the original had been filed with the Internal Revenue Service, and that all he knew about the exhibit was that it was in the file of the Alva job. Except for the statements by Flour Mills' counsel as to what it was supposed to be, the instrument was not identified by anyone. Petersen objected to its being admitted in evidence, and the trial court properly refused to admit it.

The trial court's judgment against Flour Mills and in favor of Petersen included $10,607.84 for items which Flour Mills, by stipulation, admitted was properly chargeable against it for certain "extra" items not included in the prime contract and the contract price thereunder, and $24,685.30 for extra work, labor and materials not called for by the prime contract, furnished by Petersen at the special instance and request

of Flour Mills; and, its judgment against Flour Mills and Petersen and in favor of American included $6,618.53 for extra work, labor and materials not called for by its subcontract with Petersen, furnished by American at the special instance and request of Petersen. As we understand it, the fourth proposition does not involve the amounts allowed American for such extra items except to the extent that they are included in the amounts allowed Petersen for extras as to which Flour Mills does not admit liability; and, of course, Flour Mills does not attack the judgment in favor of Petersen with respect to the $10,607.84 as to which it admits liability.

Flour Mills first calls attention to the following provisions of Articles 15 and 16 of the "General Conditions" of the prime contract:

(Article 15) " * * * no extra work or change shall be made unless in pursuance of a written order from the Owner signed or countersigned by the Engineer, or a written order from the Engineer stating that the Owner has authorized the extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered. * * * In any case, the Engineer shall certify to the amount including reasonable allowance for overhead and profit, due to the contractor. Pending final determination of value, payments on account of changes shall be made on the Engineer's certificate."

(Article 16) "If the Contractor claims that any instructions by drawings or otherwise involve extra cost under this contract, he shall give the Engineer written notice thereof within a reasonable time after the receipt of such instructions, and in any event before proceeding to execute the work, except in emergency endangering life or property, and the procedure shall then be as provided for changes in the work. No such claim shall be valid unless so made."

Apparently, Flour Mills mentions Article 16, supra, not because it contends that both

Articles 15 and 16 are applicable to extra work or changes in the plans and specifications, but because it contends, in one part of its argument under the fourth proposition, that some of the items in question do not represent extra work or changes in the plans and specifications but represent extra costs of performing work included in the prime contract, for which the contractor cannot recover additional compensation, citing Bearden v. Smith et al. (1954), Okl., 274 P.2d 1015. In connection with this last-mentioned contention, and another contention, also made in Flour Mills argument under the fourth proposition, that some of the items in question are included in the plans and specifications under prime contract and, therefore, do not represent extra work or changes in the plans and specifications, we note that in its findings of fact the trial court found that all of the items in question, as well as all of those that Flour Mills admits are properly chargeable against it, represent extra work, labor or materials not included in the prime contract, furnished at the special instance and request of Flour Mills, and we also note that Flour Mills does not contend in its briefs that the trial court's judgment with respect to such items is not supported by the evidence or is contrary to the evidence. Such finding by the trial court not only makes the two last-mentioned contentions untenable and eliminates the necessity of considering Article 16, supra, in connection with Flour Mills' basic argument under the fourth proposition, but such finding also of necessity implies and includes a finding that all of the persons who purported to represent Flour Mills in the transactions involving all of the extra items for which the trial court rendered judgment against Flour Mills were duly authorized to do what they did in that regard (and Flour Mills does not deny the authority of any such person)—an important factor in considering Flour Mills' basic argument under the fourth proposition.

It is at least tacitly admitted that there was no compliance with the above quoted provisions of Article 15 of the "General

Conditions" of the prime contract with respect to any of the extra items for which the trial court rendered judgment against Flour Mills (including those as to which Flour Mills admits liability), except that there was written authority for one such item that Flour Mills contended was included in the plans and specifications of the prime contract, but there was no certificate by the project engineer with respect to the amount, if any, to be allowed for that item.

Flour Mills' basic argument under the fourth proposition is that since the procedure prescribed in the prime contract for the allowance and payment of claims for such items was not followed in connection with any of the items in question, Flour Mills cannot be charged for any of such items, so that, in rendering judgment thereon against Flour Mills, in any amount, the trial court ignored these provisions of the prime contract. In support thereof, Flour Mills cites Jackson Materials Co. v. Grand River Dam Authority (1945), 197 Okl. 353, 170 P.2d 552, and State Highway Commission et al. v. Green-Boots Construction Co. (1947), 199 Okl. 477, 187 P.2d 209.

The State Highway Commission and the Grand River Dam Authority were created by statute as agencies of the state. Only the Highway Commission was authorized by statute to incur indebtedness against state funds for highway purposes, and only the directors of the Grand River Dam Authority were authorized by statute to incur indebtedness against its funds; and, although it is probable that, under such statutes, either body could have authorized its engineers to authorize or agree either in writing or orally to extra work or changes in the plans and specifications, or could have ratified such action, so as to incur indebtedness against the funds in question, there was no evidence in either of those cases that the governing body in question had authorized, or ratified, its engineer's action in orally authorizing, or agreeing to, the extra items in question in those cases. That was the reason that in the Grand

River Dam Authority case this court rejected the contractor's contention that the executed oral agreement with the Authority's engineer for payment for the extra work ordered or authorized by him modified or altered the written contract involved therein insofar as it required that extra work be authorized by the engineer in writing. In addition thereto, in the Grand River Dam Authority case, each of two of the extra items sued for involved an expenditure of more than $10,000.00 and, in the absence of authorization or ratification by three of the directors of the Authority, such agreement by the engineer was void under 82 O.S.1941, § 863, which provides that no contracts which involve an amount greater than $10,000.00 shall be valid unless authorized or ratified by the affirmative vote of three directors, and the written contract involved in that case contained a provision (not contained in the prime contract involved in the present case) that, by failure to comply with the procedure prescribed therein concerning extra work, the contractor shall be deemed to have performed such extra work without charge and shall be entitled to no compensation therefor. If anything, these two cases—even disregarding the additional factors that were present in the Grand River Dam Authority case—are contrary to, rather than in support of, Flour Mills' basic argument. The opposite result was reached in Oklahoma City v. Derr (1925), 109 Okl. 192, 235 P. 218, wherein the written contract involved provided that no change shall be made in said contract or the plans and specifications for any section of the work done under this contract without the written consent of said city or its engineer, and the change in question was authorized, orally, by the city council and engineer in a meeting with the contractor.

■ Because those who authorized the extra work and changes in the plans and specifications involved in the present proposition were authorized by Flour Mills to do so, the facts in the present case are comparable to the facts involved in Kenison et ux. v. Baldwin (1960), Okl., 351 P.

2d 307. In that case, the construction contract provided that the owner reserved the right to make any changes in the plans and specifications "with the understanding that such changes are to be made in writing." The owner orally requested the changes in question therein, and the contractor completed the building in accordance therewith. In affirming a judgment for the contractor for such items, this court said:

"Under the circumstances of this case the contract was changed by the executed oral agreement and all are now bound by such agreement."

citing Davis et al. v. Standard Insurance Co. (1955), Okl., 280 P.2d 462, and 15 O.S. 1951, § 237, which now appears as 15 O.S. 1961, § 237 and provides that, "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

The same principle of treating the contractee's oral request for extra work or for changes in the plans and specifications, carried out by the contractor, as constituting an executed oral contract altering the prior, written construction contract, is recognized by this court in Jackson Materials Co. v. Grand River Dam Authority, supra, at page 560 of the Pacific report of the opinion, but was not applied therein because the person who made the subsequent oral agreements involved therein had not been authorized to do so and his action in doing so had not been ratified by the only entity authorized by statute to make such agreements.

Kenison et ux. v. Baldwin, supra, not only disposes of Flour Mills' basic argument under the fourth proposition but also negatives Flour Mills' incidental argument that the trial court's judgment against it on the extra items in question had to be based upon the theory of waiver, by Flour Mills, of the contractual requirements concerning extra work and changes in the plans and specifications, and that the requisites of waiver were not shown.

■ Flour Mills' last argument under the fourth proposition is that the trial

court's judgment for "extras" in favor of Petersen includes $975.50 for having to unload steel at a railroad siding away from the job-site and trucking it to the job-site, and $2,092.40 for erecting the structural steel before completion of the concrete floor of the building, all of which was done by American and which American did charge Petersen for and not include in its lien claim, so that under State ex rel. Brett v. North American Life Ins. Co. (1950), 203 Okl. 672, 225 P.2d 796, any claim that American might have had against Petersen for such items is barred by the present action, and therefore Flour Mills should not have to pay Petersen who is not, and cannot be, out anything with respect to those two items. It seems to be admitted that American did bill Petersen for these two items but overlooked them in preparing its claim of lien and, as a consequence, did not claim either item in this case. Assuming, without deciding, that Petersen could successfully plead, in a subsequent action by American on these items, that American cannot maintain an action thereon because the obligation therefor was in existence at the time the present action was commenced by American and therefore could only be had in the present action, we know of no principle of law which would make such a plea automatic or require Petersen to so plead, or which would prevent Petersen from voluntarily paying such lawful obligation without suit thereon.

The fourth proposition cannot be sustained.

■ The fifth proposition involves the $9,500.00 attorneys' fee that the trial court allowed American for its attorneys and taxed against Flour Mills as a part of the costs of the action. 42 O.S.1961, § 176 provides that:

"In an action brought to enforce any lien the party for whom judgment is rendered shall be entitled to recover a reasonable attorney's fee, to be fixed by the court, which shall be taxed as costs in the action."

Since Petersen did not seek to establish a lien against the real property involved in

the action (and there was no question of priority of liens as between Petersen and American), and the trial court in its judgment established American's claim of lien in the full amount claimed by it, the allowance of a reasonable attorneys' fee for American's attorneys in such lien-enforcement action between American and Flour Mills as the owner of the real property involved, and the taxing of the same against Flour Mills as a part of the costs of the action, without charging or surcharging any part of such fee against Petersen, who was not a party to the action insofar as the enforcement of liens is concerned, was in full accord with 42 O.S.1961, § 176. Flour Mills seems to recognize this, for except for a contention that the fee allowed is excessive in amount, it does not question the allowance of the fee or the taxing of the same against it as a part of the costs of the action.

Flour Mills quotes a portion of Article 32 of the "General Conditions" of the prime contract:

"Neither the final payment nor any part of the retained percentage shall become due until the Contractor, if required, shall deliver to the Owner a complete release of all liens arising out of this Contract, * * *. *If any lien remain unsatisfied after all payments are made, the Contractor shall refund to the Owner all moneys that the latter may be compelled to pay in discharging such a lien, including all costs and a reasonable attorney's fee;*"

and argues that in failing to surcharge Petersen for any attorneys' fee allowed American for its attorney by crediting any amount paid by Flour Mills on such attorneys' fee against any amount found to be due from Flour Mills to Petersen, the trial court ignored that portion of said Article 32 that is emphasized above.

■ As we construe the language in question, it is applicable where after making final payment to Petersen under the prime contract, Flour Mills is compelled to pay out an additional amount to satisfy or discharge an unsatisfied lien. That is not the situation involved herein, for even under the trial court's judgment, Flour Mills will receive full credit against the amount found to be due Petersen under the prime contract for any amount paid by Flour Mills in discharge of American's lien in the principal amount of $64,388.53 with interest thereon at the rate of six per cent per annum from the date of the judgment. This argument by Flour Mills is untenable.

■ Concerning its contention that the $9,500.00 attorneys' fee allowed American for its attorneys' services is excessive in amount, Flour Mills does not contend that there was no evidence to support such a fee as being "reasonable" in the circumstances, but assumes that in fixing the amount of the fee to be allowed the trial court must have disregarded certain factors within the knowledge of the trial court which Flour Mills, without citing any authority therefor, considers as being matters that must be considered by a court in fixing a reasonable attorney's fee in such a case as this. Even assuming that all of the factors mentioned by Flour Mills must be considered by a court in fixing a reasonable attorney's fee in such a case, we cannot assume that the trial court disregarded any one of them in fixing $9,500.00 as a reasonable fee for American's attorneys in this case.

The fifth proposition cannot be sustained.

The sixth proposition involves the trial court's action in granting American judgment over against Flour Mills for that part of the interest accrued from August 1, 1961, to February 24, 1964, the effective date of the trial court's judgment in the case, on Belger's judgment against American in the principal amount of $8,333.32, with interest thereon at the rate of six per cent per annum from August 1, 1961, until paid.

Flour Mills does not question the action of the trial court in establishing as a first and prior lien against the real property involved Belger's claim in the principal

amount of $8,333.32 with interest thereon at the rate of six per cent per annum from August 1, 1961, until paid. It simply contends that it had no contract of any kind with Belger; that Belger's contract (under which the trial court allowed Belger interest from August 1, 1961, on its claim) was with American; and that Flour Mills should not be penalized for American's failure to pay Belger's admittedly correct claim against it before interest would start to accrue on such claim.

In its motion for such judgment over against Flour Mills and in its brief in this court, American contends, in effect, that because Flour Mills withheld final payment to Petersen in order to have money to cover a part of the damages asserted in this cause of action against Petersen and American, Petersen could not pay American the amounts due under its subcontract with Petersen and for "extras," and that this left American without money to pay Belger's claim, so that it was all the fault of Flour Mills that Belger's claim was not paid before interest started to accrue thereon. There would seem to be no question but that this, coupled with the denial of Flour Mills' cross-actions against Petersen and American for damages, was the basis of the trial court's action in granting American judgment over against Flour Mills for the item of interest under attack in this proposition.

■ Flour Mills cites no authority to support its proposition, and American cites no authority to support this action of the trial court. We do not think that there was any substantial basis for such ruling and are constrained to hold that if the trial court had any discretion in the matter (which need not be decided herein), it abused its discretion in granting American judgment over against Flour Mills for any of the interest involved in Belger's judgment against American.

In the seventh proposition, Flour Mills contends that, as shown by uncontroverted evidence, it had commitments for the storage of June harvest wheat, the total amount of which the trial court would not allow it to prove, and that in an attempt to minimize its damages resulting from the failure of Petersen and American to complete the building in question according to the time schedule prescribed in the prime contract, it did on the 19th day of July 1961 (at a time when its own witnesses state compartments Nos. 2 and 3 had not been completed and there was a large hole in one wall of one of those compartments for the passage of tractors and cranes being used by American in doing the structural steel work involved in the construction of the building and there was no roof at all on a portion of one of those compartments), cause 495.66 bushels of wheat to be stored in compartment No. 1; that, as disclosed by the evidence, this 495.66 bushels of wheat worth $2.00 per bushel at the time became worthless as a result of water damage; and that under the law it is entitled to recover for the damages so sustained in an attempt to minimize its damages.

As the law under which it contends it is entitled to recover for the damages to this 495.66 bushels of wheat, Flour Mills quotes the second paragraph of the syllabus to Murduck et al. v. City of Blackwell (1946), 198 Okl. 171, 176 P.2d 1002;

"Where the person, injured by the wrongful act of another, uses reasonable care to reduce the loss to him, he can recover from the wrongdoer in full for all damages, even though his own efforts to reduce the loss have increased it."

and Section 336(2) of the Restatement of the Law of Contracts:

"Damages are recoverable for special losses incurred in a reasonable effort, whether successful or not, to avoid harm that the defendant had reason to foresee as a probable result of his breach when the contract was made."

■ With respect to the water damage to this 495.66 bushels of wheat, the trial court found, among other things, that "such loss was a result of an assumption of risk by the owner in storing grain in said building at a time when it was unpro-

tected from possible contact with water due to the incomplete stage of the construction; and that neither the plaintiff [American] nor the defendant Petersen should be held responsible for such loss," which, we think, was a finding in effect that in the circumstances, Flour Mills' action in storing the wheat in the building did not constitute the exercise of reasonable care. Furthermore, as we understand it, the damage which Flour Mills now claims it was attempting to mitigate by storing this wheat in the building before it had been completed was damage that would result from the failure of Petersen and American to complete their work within the time schedule prescribed in the prime contract, for which such contract provides liquidated damages at the rate of $200.00 per day of delay. Flour Mills does not contend that its action was a good faith attempt on its part to reduce the delay in question and thus reduce the total amount of liquidated damages for which Petersen would be liable under that provision of the prime contract, if valid. We fail to see how it may be said that Flour Mills' action constituted a good faith attempt on its part to mitigate the damages in question. The principle of law relied upon by Flour Mills has no application to the present case, and the seventh proposition cannot be sustained.

The eighth proposition is that a performance bond is not "labor" or "material" within the meaning of those terms as used in the applicable mechanics' and materialmen's lien statutes, and that, therefore, American's lien in the principal amount of $64,388.53, as established by the trial court, should be reduced by the separate item of $1,303.86 included therein for premium on performance bond furnished by American.

The applicable statutes (42 O.S.1961, §§ 141 and 143) provide, in pertinent part, that:

"Any person who shall, under oral or written contract with the owner of any tract or piece of land, perform labor, or furnish material for the erection, alteration or repair of any building, improve-

ment or structure thereon, * * * shall have a lien upon the whole of said tract or piece of land, the buildings and appurtenances. * * *."

"Any person who shall furnish any such material or perform such labor as a subcontractor, * * * may obtain a lien upon such land, or improvements, or both, from the same time, in the same manner, and to the same extent as the original contractor, for the amount due him for such material and labor; * * *."

Neither Flour Mills nor American cites a case involving this question or, as we see it, an analogous question, and apparently it is a matter of first impression with this court.

We agree with Flour Mills that a performance bond provided in connection with a contract such as the one involved herein is neither "labor" nor "material" within the meaning of those terms as used in 42 O.S.1961, §§ 141 and 143, supra, and cannot serve as the basis for a lien under either of those statutes. The $64,388.53 principal amount of American's lien against the property involved in this action (but not the principal amount of American's personal judgment against Flour Mills and Petersen) must be reduced by the $1,303.86 included therein, as a separate and distinct item, for premium on performance bond. The trial court's judgment is modified accordingly.

American's cross-appeal presents the single proposition that the trial court erred in refusing to allow American interest at the legal rate on the full amount of its claim from its due date. It quotes 23 O.S.1961, § 6, which provides that:

"Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, * * *;"

and quotes the following from Blackwell Oil & Gas Co. v. Mid-Continent Petroleum

Corporation (1937), 182 Okl. 588, 79 P.2d 227, 232:

"While the prayer of the oil company's petition does not pray for interest, it does pray 'that said plaintiff shall have and recover for the costs of this action and such other and further relief as is just and equitable,' and we have frequently held that in a suit in equity a prayer for general relief entitled the plaintiff to any and all specific relief which might have been prayed for. Interstate Mortgage Trust Co. v. Cunningham, 78 Okl. 62, 188 P. 1081; Henderson et al. v. Arkansas et al., 71 Okl. 253, 176 P. 751; Brown v. Privette et al., 109 Okl. 1, 234 P. 577.

The cited case was in equity for an accounting.

■ Although that part of this action which is for the establishment and foreclosure of the lien claimed by American is equitable in nature, that part of the action which is for the recovery of a money judgment is not equitable in nature but is legal in nature. Hughes v. Baker et al. (1934), 169 Okl. 320, 35 P.2d 926.

In its brief, American asks this court to overrule the trial court on this issue and to remand the cause with directions to allow American interest on its recovery from August 9, 1961, instead of from the date of the judgment. The prayer of American's original petition herein, which it "reiterated" in all of its subsequent pleadings prior to the trial of this cause, was not general but was specific:

"Wherefore, plaintiff prays judgment against the defendants Bewley Mills, Inc. [which, during the pendency of the action, became Flour Mills of America, Inc.], and H. T. Petersen, a sole trader doing business as P & M Sales, for the sum of sixty-four thousand three hundred eighty-eight and 53/100 dollars ($64,388.53), *with interest thereon at the rate of six per centum per annum from the date of judgment until paid,* for a reasonable attorney's fee for the use and

benefit of legal counsel for plaintiff, and for the costs of this action."

Particularly if it be assumed that, as contended by American, its claim was certain, or capable .of being made certain by calculation, and its right to recover thereon was vested in it on a particular day—a matter which it is not necessary for us to decide herein—it was not impossible for American to state in the prayer of its petition the time or times from which interest was to be computed. At any rate, it specifically stated in the prayer of its petition, as required by 12 O.S.1961, § 264, the amount of money demanded and the time from which interest was to be computed· thereon, and the trial court rendered judgment for American in exact accordance with such prayer. Blackwell Oil & Gas Co. v. Mid-Continent Petroleum Corporation, supra, is not in point herein except to the extent that it would infer that American is precluded, by the provisions of 12 O.S.1961, § 264, from recovering judgment for more money or for more interest than it so specified in its petition.

When the demand for relief to which a plaintiff supposes himself entitled, as set forth in the prayer of a petition, is the recovery of money with interest thereon, and in accordance with the requirements of 12 O.S.1961, § 264, the plaintiff specifically states in such prayer for relief, the amount of money demanded and the time from which interest is to be computed thereon, may the plaintiff recover interest from a date earlier than that so specified?

Apparently, this court has not passed upon that particular question. At least the parties have cited no such case and we have found no such decision. However, the Territorial statute that now appears as 12 O.S.1961, § 264 was taken in 1893 from the Kansas Civil Code. It is, verbatim, the same as Section 87 of that code. Oklahoma Gas & Electric Co. v. Lukert (1906), 16 Okl. 397, 84 P. 1076, 1079. In the 1891 case of Phenix Ins. Co. of Brooklyn v. Weeks, 45 Kan. 751, 26 P. 410, the Supreme Court of Kansas, citing that statute, held that: "Where the prayer of a petition

asks for interest from a certain date the plaintiff cannot recover interest from a prior date." Insofar as the binding effect under 12 O.S.1961, § 264 is concerned, we perceive no distinction between the statement in the prayer of a petition of the amount of money demanded, and the statement in the prayer of a petition of the time from which interest is to be computed. In Strahm et al. v. Murry (1948), 200 Okl. 640, 199 P.2d 603, this court held that a judgment for damages in an amount greater than that sought in the petition cannot be sustained, although supported by the evidence.

We now hold that when the demand for relief to which a plaintiff supposes himself entitled, as set forth in the prayer of his petition, is the recovery of money with interest thereon, and in accordance with the requirements of 12 O.S. 1961, § 264, the plaintiff specifically states in such prayer for relief the amount of money demanded and the time from which interest is to be computed thereon, the plaintiff may not recover interest from a date earlier than that so specified.

American's cross-appeal is denied.

That part of the trial court's judgment which establishes a mechanic's and materialman's lien against the real property involved in this action in favor of the plaintiff, American Steel Building Company, Inc., hereby is modified by reducing the $64,388.53 principal amount secured thereby to $63,084.67; that part of the trial court's judgment which grants the plaintiff, American Steel Building Company, Inc., a judgment over against the defendant, Flour Mills of America, Inc., for a part of the interest included in the judgment in favor of the defendant, Belger Cartage Service, Inc., and against the plaintiff, American Steel Building Company, Inc., is reversed. That part of the trial court's judgment against the defendant, Flour Mills of America, Inc., with respect to its cross-actions against the plaintiff, American Steel Building Company, Inc., and the defendant, H. T. Petersen, a sole trader doing business as P & M Sales, for liquidated damages provided for in the prime contract between the defendant, Flour Mills of America, Inc., and the defendant, H. T. Petersen, a sole trader doing business as P & M Sales, for failure to complete the contract work within the time provided therefor in such contract is hereby reversed. Otherwise, the judgment of the trial court, as modified herein, is affirmed, subject, however, to adjustments, if any, made necessary and proper as a result of a new trial on the question of liquidated damages hereinafter mentioned.

The defendant Flour Mills of America, Inc., has filed its motion to tax costs herein upon determination of this appeal. Since the judgment of the trial court is reversed in part and affirmed in part, the costs in this court, consisting of cost deposit of $25.00 and expenses of reporter and preparation of case made of $1716.20, are divided one-half to Flour Mills of America, Inc., and one-half to American Steel Building Company, Inc., and H. T. Petersen, pursuant to provisions of 12 O. S.1961, § 978.

The cause hereby is remanded to the trial court with directions to grant a new trial with respect to the claim of the defendant, Flour Mills of America, Inc., against the plaintiff, American Steel Building Company, Inc., and the defendant, H. T. Petersen, a sole trader doing business as P & M Sales, for liquidated damages, and after such a new trial, to render such judgment or judgments as between those three parties as may be proper in view of this opinion.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS, BERRY, HODGES and McINERNEY, JJ., concur.

BLACKBIRD, J., dissents.